```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
         ASHEVILLE DIVISION
          1:15-cv-132-FDW
```

| | |
|---|---|
| DUSTIN EARL JONES, )<br> )<br>    Plaintiff, )<br> )<br>  vs. )<br> )<br> )<br> )<br>HENDERSON COUNTY )<br>DETENTION DENTER, et al., )<br> )<br>    Defendants. )<br>_____ ) | **ORDER** |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendant Jenny Griffith, (Doc. No. 28).

**I. BACKGROUND**

**A. Procedural Background**

Pro se Plaintiff Dustin Jones, a former North Carolina prisoner, filed this action on July 6, 2015, pursuant to 42 U.S.C. § 1983, alleging claims of excessive force and failure to protect against the moving Defendant Jenny Griffith, a Henderson County Sheriff's Office deputy at all relevant times. (Doc. No. 1). Plaintiff also purported to bring a claim for deliberate indifference to serious medical needs against Darla Dunaway, a nurse at the jail. Finally, Plaintiff also purported to name as a defendant the Henderson County Detention Center ("the jail"). On October 14, 2015, after initial review, this Court dismissed the jail as a Defendant, held that Plaintiff stated a claim against Griffith for excessive force and failure to protect only,

1

and ordered Plaintiff to add more factual allegations concerning personal participation by Dunaway. (Doc. No. 7). The Court ultimately dismissed all claims against Dunaway on July 5, 2016. (Doc. No. 20). Plaintiff's only remaining claims are against movant Defendant Griffith for excessive force and failure to protect.

On December 9, 2016, Defendant filed the pending summary judgment motion. (Doc. No. 28). On December 12, 2016, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 29). Plaintiff did not respond to the summary judgment motion, and the time to do so has passed.[1]

**B.     Factual Background**

**1.     The Alleged Excessive Force Incident and the Summary Judgment Evidence**

**a.     Plaintiff's Allegations**

Because Plaintiff did not present any evidence on summary judgment, the Court has before it only the allegations made in the Complaint. Plaintiff alleged in the Complaint that on May 16, 2015:

> I . . . [w]as attacked in my cell at Henderson County Detention Center. I am a keep away on 23-hour lock down. I was in my cell and had just finished my lunch tray and was at my cell door waiting to place my tray outside it. They do not allow inmates to be out during

---

[1] Because Plaintiff did not file a response to the summary judgment motion, he is deemed to have abandoned his claims. See <u>Crosby v. Gastonia</u>, 635 F.3d 634, 638 n.3 (4th Cir. 2011). In an abundance of caution, however, the Court will address the merits of Plaintiff's claims. The Court further notes that on, January 3, 2017, the Court entered an order requiring Plaintiff to notify the Court of his new address after learning that Plaintiff had been released from state prison. (Doc. No. 32). Plaintiff did not respond, but on January 4, 2017, Defendant Griffith responded to notify the Court of Plaintiff's last known address. (Doc. No. 33). On January 17, 2017, the Clerk mailed the Court's Roseboro order and the order dated January 3 to Plaintiff at his last known address, but Plaintiff has not responded. (Doc. No. 34).

2

lunch. Only after lunch to pick up trays. On this day they had let some inmates out before we put our trays out . . . . They watch our doors opening them one at a time so we can place our trays outside of them. [Inmate Gordon] had walked to my door and was pacing back and forward in front of it waiting on them to open it.

When they opened it [the other inmate] leaped in my cell and started attacking me by punching me in the head and face. While watching they close[d] the door behind him where I cannot escape the attack. Finally they come to the door open it and shoot me with a tazer. They start tazing me while I am still being attacked. After finally stopping the attack the nurse checks me deciding immediately I need to go to the nearest emergency room. While taking me out they inform me that it was a rule that I had to be charged with assault and battery, lose my canteen and visitations for 2 weeks.

I get to the hospital . . . where the doctors and nurses have to glue my eyebrow back together.

Both my eyes were black and my right eye was swelled shut. The doctor requested me seeing a follow-up with a specialist for the wounds and to check my vision which I never got. It took weeks for my face to heal but the trauma and fear from the attack never has. Every time the doors open and close I am traumatized. I can't sleep or eat well. These doors open all day and night and are very noisy. I stay in fear and am very jumpy. They later charged me with assault and battery . . . . It was dismissed but is still on my record where I was charged and looks very bad on my court case and I am still traumatized and remain in fear. And I am permanently scarred on my face.

(Doc. No. 1 at 6).

    **b.**     <u>**Defendant's Summary Judgment Materials**</u>

In support of the summary judgment motion, Defendant Jenny Griffith has submitted as exhibits excerpts from Plaintiff's deposition and Defendant's own sworn declaration.[2] (Doc. No. 28-3: Pl.'s Dep.; Doc. No. 28-4: Griffith Decl.). Defendant's evidence on summary judgment shows that Plaintiff was incarcerated in the jail in March 2015 after being arrested for assault with a deadly weapon for shooting someone. (Doc. No. 28-3 at 11: 24-25; 12: 1-4, 19-21). Due to the nature of these charges, Plaintiff was placed in the Special Housing Unit, where he was let out of his cell for one hour a day and had no contact with other inmates. (<u>Id.</u> at 15: 12-17, 20-

---

[2] On February 13, 2017, Plaintiff supplemented the memorandum for the sole purpose of adding two pages from Plaintiff's deposition that inadvertently were not included in the original exhibits filed by Defendant. <u>See</u> (Doc. No. 35).

24).  Griffith was a deputy sheriff in the detention division and was assigned to supervise inmates at the jail.  (Doc. No. 28-4 at ¶ 3).  Inmate Michael Gordon was also incarcerated in special housing.  (Doc. No. 28-3 at 15: 22-25; 16: 1).  Before May 16, 2015, Plaintiff and Gordon were "friends" and "old acquaintances," whose parents went to church together, and who Plaintiff characterized as a "good friend[]," up until he was assaulted by Gordon in jail.  (Id. at 13: 18-20; 14: 1-21).  During their time in jail together from March until May 16, 2015, they saw each other and said "what's up or something like that" without any altercations.  (Id. at 16: 21-24; 42: 21-25; 43: 1-2).

On May 16, 2015, Plaintiff had just finished dinner in his cell, and he was waiting to have his cell door unlocked to put his tray out.[3]  When Plaintiff finished his meal, he was "standing in his cell waiting to kick [his] tray out," and Plaintiff observed Gordon walking in front of Plaintiff's cell.  (Id. at 43: 6-21).  When Plaintiff's cell door opened to allow him to put his tray out, Gordon jumped in the cell.  (Id. at 13: 24-25).  Gordon then started hitting Plaintiff in the left side of the head.  (Id. at 25: 10-16).  In order to defend himself, Plaintiff grabbed Gordon and swung him around behind Plaintiff.  (Id. at 25: 17-22).  During the altercation, Gordon punched Plaintiff four to five times in the head, face, and body.  (Doc. No. 35 at 33: 15-20).  The fight lasted "maybe a minute."  (Doc. No. 28-3 at 29: 25; 30: 1-4).

Defendant Griffith was serving dinner in the jail's minimum housing pod when she heard sheriff's deputy Tommy Harper yell on the radio that two inmates were fighting in the Special Housing Unit.  (Doc. No. 28-4 at ¶ 5).  Griffith ran to the Special Housing Unit and heard screaming and yelling from Cell HA 114A.  (Id. at ¶ 6).  She saw Plaintiff and Gordon entangled

---

[3] Inmates eat meals in their cells.  (Doc. No. 28-3 at 19: 12-25).  When inmates are finished eating, their cells are opened and they slide their trays out to be picked up.

4

in a fight inside Plaintiff's cell. (Id.). She was the first officer on the scene. (Id.). Griffith ran into the cell and yelled "get off" to Plaintiff and Gordon.[4] (Id. at ¶ 7). Neither inmate complied with Griffith's order. (Id. at ¶ 8). From Griffith's perspective, both Plaintiff and Gordon posed an immediate threat to one another's safety. (Id.). Both also appeared to be reasonably capable of injuring Griffith if she attempted to physically intervene in the fight. (Id.). In order to break up the fight and prevent injury to either inmate, Griffith discharged her TASER from eight feet away. (Id. at ¶ 9). According to Griffith, the TASER prongs hit Plaintiff's shirt.[5] (Id. at ¶ 11). When the inmates heard the sound of the TASER they released their hold of one another, separated, and then got down on the floor with their faces down and hands behind their backs. (Id. at ¶ 9). Plaintiff claims that he was hit by the TASER, and then a male officer told them to get on the ground. (Doc. No. 28-3 at 23: 16-18; 46: 2-4). When Plaintiff went to the ground, Gordon's head hit the right side of Plaintiff's face. (Id. at 24: 6-14). Plaintiff suffered a split eyebrow as a result. (Id. at 39: 8-9).

Deputies Nancy Owens and Chris Heatherly entered the cell and placed Plaintiff and Gordon in handcuffs. (Doc. No. 28-4 at ¶ 10). Griffith then located one TASER barb on Plaintiff's shirt and the other under Plaintiff's left arm. The jail nurse arrived, removed barbs from Plaintiff, and determined that the cut on his eyebrow required medical attention. (Id. at ¶

---

[4] Plaintiff stated in his deposition that he did not hear Griffith say anything to him and Gordon before she used the TASER against them to stop the fight. (Doc. No. 28-3 at 30: 16-17). This does not create an issue of fact sufficient to deny summary judgment because there is no dispute that the fight continued until Griffith discharged her TASER and, as the Court discusses, infra, her use of force was reasonable under the circumstances.

[5] Griffith states in her affidavit that the TASER did not activate, i.e., send a shockwave to Plaintiff. (Id.). Plaintiff stated in his deposition that the TASER activated and therefore sent a shock through him. (Doc. No. 28-3 at 24: 18-22). This issue of disputed fact does not preclude summary judgment for Defendants because, even assuming the TASER activated, Defendant Griffith's use of force was reasonable under the circumstances, as the Court discusses, infra.

5

12).

Plaintiff and Gordon were charged with assault as a result of the fight, but these charges were ultimately dismissed. (Doc. No. 28-3 at 29: 7-11; 35: 2-5). Griffith states that she had no knowledge before the incident that Plaintiff was at risk of being assaulted by Gordon and that Plaintiff never informed Griffith about any problems he had with Gordon before the attack. (Doc. No. 28-4 at ¶¶ 14, 15).

## II.	STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th

6

Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

### III. DISCUSSION

**A. Plaintiff's Excessive Force Claim**

In support of her summary judgment motion, Defendant Griffith first contends she is entitled to summary judgment for the excessive force claim because the single discharge of her TASER to break up a fight between Plaintiff and inmate Gordon was an objectively reasonable attempt to maintain order and discipline at the jail. For the following reasons, this Court agrees.

As Plaintiff was a pre-trial detainee when the incident occurred, his excessive force claim is analyzed under the Fourteenth Amendment. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). To prevail on his excessive force claim, Plaintiff must establish that the force used by Griffith was objectively unreasonable. Id. In Kingsley, the Supreme Court set forth several factors in assessing whether an officer's use of force was reasonable:

7

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the Plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 2473 (citing Graham v. Connor, 490 U.S. 386, 395, 396 (1989)). In assessing whether Griffith used excessive force, this Court must make that determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing Bell v. Wolfish, 441 U.S. 520, 540 (1979)). In addition, the Court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" Id.

Applying the Kingsley factors, the Court finds that Defendant Griffith's use of force was objectively reasonable. First, the relationship between the need for force and the amount of force used to restore discipline was closely matched. The force began after Plaintiff and Gordon began fighting, and it ended when the fighting stopped. It is undisputed that Griffith discharged her TASER only one time. (Doc. No. 28-3 at 44: 19-22; Doc. No. 28-4 at ¶ 9). No force was used after Plaintiff and Gordon stopped fighting, and no other means of force such as pepper spray, batons, or fists were used. (Doc. No. 35 at 37: 16-19). As the Seventh Circuit has stated, "[i]n many circumstances—often when faced with aggression, disruption, or physical threat—compelling compliance with an order is a valid penological justification for use of a taser." Lewis v. Downey, 581 F.3d 467, 477 (7th Cir. 2009). Other courts have held that other, similar uses of force were proportionate to the need to restore discipline. See, e.g., Clement v. Gomez,

8

298 F.3d 898, 904 (9th Cir. 2002) (holding that the use of two, five-second bursts of pepper spray was not excessive when used to break up a fight among inmates after they had repeatedly ignored verbal commands to stop); Williams v. Benjamin, 77 F.3d 756, 762-63 (4th Cir. 1996) (holding that the use of chemical mace was not excessive when a prisoner disobeyed an order to stop throwing water at a guard and then questioned the guard's second order to remove his arm from his cell's food service window).

Second, while Plaintiff suffered a split eyebrow after getting hit by Gordon's head, (Doc. No. 28-3 at 39: 1-7), he suffered only minimal injuries from the use of the TASER, including a hole where the barb of the TASER pricked him and the "pain . . . from getting electrocuted." (Id. at 30: 22-25; 31: 1-2). Plaintiff did not require any medication from these injuries. (Id. at 31: 3-5). According to Plaintiff, the injury he suffered from getting hit by Gordon's head was "the main injury." (Id. at 31: 9-10).

Third, according to Griffith, she attempted to prevent the use of force by first yelling at the inmates to get off one another, but they ignored her command.[6] (Doc. No. 28-4 at ¶ 7). Fearing that she would be injured if she tried to intervene, Griffith deployed her TASER one time. (Id. at ¶¶ 8-9). When the fighting stopped, no additional force was employed.

Fourth, the fighting between Plaintiff and Gordon clearly presented a serious security problem. The Supreme Court has repeatedly observed that prisons present an "ever-present potential for violent confrontation." Whitley v. Albers, 475 U.S. 312, 321 (1986) (quoting Jones

---

[6] As noted, supra, Plaintiff denies hearing Griffith say anything to him and Gordon before using the TASER one time. Even if Plaintiff used the TASER to stop the fight without first telling the inmates to stop fighting, the use of force was nevertheless reasonable under the circumstances. In other words, Griffith was not required to politely stand and ask the inmates to cease their physical fight before she intervened.

9

v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977)). Consequently, the Supreme Court has concluded that security is the overriding penological interest at stake in any jail or prison. "[T]he core functions of prison administration [are] maintaining safety and internal security." Turner v. Safley, 482 U.S. 78, 92 (1987). The lower courts have also agreed that inmate fights pose serious security problems. See Rodriguez v. Ghoslaw, No. 98 Civ. 4658(GEL), 2001 WL 755398, at *5 (S.D.N.Y. July 5, 2001) (unpublished) ("Deliberately allowing inmates to engage in violence to settle their own scores . . . would surely violate fundamental standards of human dignity embodied in the Eighth Amendment.").

Finally, from Griffith's perspective, the threat to Plaintiff, Gordon, and herself was serious. (Doc. No. 28-4 at ¶ 8). When Griffith arrived at Plaintiff's cell, it appeared to her that Plaintiff and Gordon posed an immediate threat to one another's safety, as well as her own if she attempted to physically intervene by herself. (Id.). Indeed, Plaintiff agreed in his deposition that if no one had come to intervene, inmate Gordon would still have been trying to punch him. (Doc. No. 28-3 at 26: 18-20). The Supreme Court has observed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). As Defendant notes, she had the following options when she went to Plaintiff's cell: 1) ignore the fight and let it continue; 2) wait until additional officers arrived and then attempt to break up the fight using their hands; 3) try and break up the fight herself with her hands; or 4) use a TASER to break up the fight. Any of these alternatives presented their own problems. For instance, had Griffith ignored the fight or waited until other officers arrived, she would be vulnerable to suit under 42 U.S.C. § 1983 on a failure to intervene theory. See Smith

v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (finding that "a corrections officer's failure to intervene in a beating can be the basis of liability ... if the corrections officer had a reasonable opportunity to intervene and simply refused to do so"); Robinson v. Prunty, 249 F.3d 862, 867 (9th Cir. 2001) (holding no qualified immunity where guards failed to intervene while one inmate attacked another). At the very least, had Griffith failed to intervene, she would be subject to state tort claims of negligence or injury to a prisoner claim. See e.g., N.C. GEN. STAT. § 162-55 (a "keeper of the jail" who does or causes to be done "any wrong or injury" to prisoners in his custody, shall pay treble damages and be guilty of a class 1 misdemeanor).

Courts have recognized that Griffith's third option—trying to break up the fight between Gordon and Plaintiff by herself—also presents risks to both the officer and the inmates. "A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy." Guzman v. Sheahan, 495 F.3d 852, 858 (7th Cir. 2007). See also Williams v. Willits, 853 F.2d 586, 591 (8th Cir. 1988) (recognizing that guards who attempted to intervene in a fight involving inmates but then stopped due to being outnumbered "made the perfectly reasonable decision that further intervention would threaten the health and safety of all concerned" because "the guards were suddenly outnumbered by inmates which event made breaking up the fight physically impossible").

As Defendant notes, in a case dealing with the use of force on prisoners, the Fourth Circuit recognized that "[i]n dealing with such agitated detainees, prison officials must not be forced to walk a tightrope and face the prospect of a lawsuit no matter which way they turn." Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999). In Grayson, a plaintiff was first pepper sprayed after he tried to get out of the cell. Id. at 694. He was then moved to another cell and,

11

during that move, was pinned down and punched by an extraction team.  Id.  The Fourth Circuit upheld the district court's grant of summary judgment for the defendant officers, noting that the "officers obviously felt the need to subdue [plaintiff] either to calm the general environment or to prevent [plaintiff] from hurting himself.  If we fail to accord due deference to officers' efforts, we would be giving encouragement to insubordination in an environment which is already volatile enough."  Id. at 697.  This case is similar to the situation encountered by the officers in Grayson.  Here, the force used was reasonable under the circumstances and Defendant therefore did not violate Plaintiff's constitutional rights.  In sum, the Court finds that Defendant Griffith is entitled to summary judgment as to Plaintiff's excessive force claim against her.

**B. Plaintiff's Failure to Protect Claim**

Defendant Griffith next contends that she is also entitled to summary judgment as to Plaintiff's failure to protect claim because she had no knowledge that Gordon posed a threat to Plaintiff.  The Court agrees.  A failure to protect claim requires proof of two elements to establish the deprivation of a constitutional right.  Farmer v. Brennan, 511 U.S. 825, 834 (1994); accord Brown v. N.C. Dep't of Corr., 612 F.3d 720, 721-23 (4th Cir. 2010).[7]  First, a plaintiff must establish a serious deprivation of his rights in the form of a "serious or significant physical or emotional injury."  Brown, 612 F.3d at 723.  Second, a plaintiff must show that the defendant had a "sufficiently culpable state of mind."  Farmer, 511 U.S. at 834.  In this context, the

---

[7] Although Plaintiff's claim is based on the Fourteenth Amendment, Eighth Amendment cases are instructive in assessing deliberate indifference Fourteenth Amendment claims.  Evans v. City of Sumter, S.C., No. 3:07-2688-JFA-JRM, 2008 WL 4177225, at *5 n.4 (D.S.C. Sept. 3, 2008) ("Because both the Fourteenth Amendment's Due Process Clause and the Eighth Amendment address the permissibility of punishment, decisions addressing the dimensions of the Eighth Amendment's prohibition of cruel and unusual punishment provide[] guidance for analysis under the Due Process Clause in several respects.").

required state of mind that must be established is a "deliberate indifference to inmate health or safety." Id. (citations omitted). A plaintiff can establish "deliberate indifference" by showing that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Id. at 837. Deliberate indifference is "a very high standard." Grayson v. Peed, 195 F.3d at 695. To meet this standard, a plaintiff must show that the defendant had actual knowledge of an excessive risk to his safety, which may be proven by circumstantial evidence that a risk was so obvious that it had to have been known. See Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015).

Here, Plaintiff has not met that burden. It is clear that not even Plaintiff, who described Gordon as a "good friend[]," (Doc. No. 28-3 at 14: 16-19), suspected that Gordon was a risk to his safety. Plaintiff has presented no evidence to suggest that Griffith knew something that even Plaintiff did not—that Gordon was going to attack Plaintiff. In fact, Griffith had no idea that Plaintiff and Gordon posed a risk of harm to one another. (Doc. No. 28-4 at ¶¶ 14-15). Plaintiff had been at the jail since the middle of March, and he had not been involved in any confrontations with Gordon, nor did he ever inform Griffith about any problems he had with Gordon. (Id.). Plaintiff never informed her that Gordon threatened him, or that Plaintiff feared him. (Id.). In fact, even Plaintiff agreed that Gordon's assault was a "surprise attack." (Doc. No. 28-3 at 44: 10-13). The evidence on summary judgment further shows that, rather than disregarding the risk to Plaintiff, Griffith ran to Plaintiff's cell and attempted to protect Plaintiff by breaking up the fight. As Plaintiff has failed to demonstrate that Griffith knew of and disregarded an excessive risk to Plaintiff's health or safety, his failure to protect claim must be dismissed. See Danser v. Stansberry, 772 F.3d 340, 347 (4th Cir. 2014).

In sum, the Court finds that Plaintiff has not raised a genuine dispute as to whether Defendant Griffith—the sole remaining Defendant in this action—used excessive force against

13

Plaintiff or whether Griffith is liable for failing to protect Plaintiff from an assault by another inmate.[8]  Thus, Defendant Griffith is entitled to summary judgment.[9]

## IV. CONCLUSION

For the reasons stated herein, the Court will grant summary judgment to Defendant and dismiss this action with prejudice.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Motion for Summary Judgment, (Doc. No. 28), is **GRANTED**, and this

---

[8] Indeed, since Plaintiff did not respond to the summary judgment motion, Plaintiff has not even attempted to present evidence raising a genuine issue of dispute on summary judgment as to either of Plaintiff's claims.

[9] Defendant raised qualified immunity as a defense to Plaintiff's excessive force and failure to protect claims. Because the Court has determined that there was no constitutional violation in the first instance, the Court does not need to determine whether Defendant is entitled to qualified immunity. The Court observes, however, that even if the Court were to find that a genuine issue of dispute existed as to whether Defendant violated Plaintiff's constitutional rights, Defendant would clearly be entitled to qualified immunity as to both the excessive force and failure to protect claims. That is, since it is well-established that an officer may use minimal force to maintain discipline, Griffith most certainly did not transgress a bright line in using her TASER one time to break up the fight between Plaintiff and Gordon. In other words, under the specific facts of this case, it cannot be said that "every reasonable official" would have understood that using a TASER to prevent injury to Plaintiff and Gordon violated Plaintiff's rights. Ashcroft v. al- Kidd, 563 U.S. 731 (2011). As a result, Griffith would be entitled to qualified immunity even if she were found to have violated Plaintiff's constitutional rights. See also Estate of Armstrong ex. rel. Armstrong, 810 F.3d 892, 907-908 (4th Cir. 2016) (granting qualified immunity to officers for use of a taser where the decedent's right not to be subjected to tasing while offering stationary and non-violent resistance to a lawful seizure was not clearly established at the time of the use of force, but declaring that as of the date of the decision (January 11, 2016), it was clearly established that "where, "during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance to being handcuffed, those officers use unreasonably excessive force."). As to the failure to protect claim, all of the evidence on summary judgment shows that the attack by inmate Gordon was a surprise, both to Plaintiff, and to Defendant. See also Berry v. Sherman, 365 F.3d 631, 634-35 (8th Cir. 2004) (officer entitled to qualified immunity where nobody, including the inmate plaintiff, believed that the inmate at substantial risk of harm of attack by another inmate).

14

action is dismissed with prejudice.

2. The Clerk is directed to terminate this action.

Signed: February 13, 2017

Frank D. Whitney
Chief United States District Judge